# **<u>EXHIBIT A</u>**

**UNITED STATES**
**POSTAL SERVICE**

Date Produced: 05/07/2018

CERTIFIED MAIL SOLUTIONS INC.:

The following is the delivery information for Certified Mail™/RRE item number 9314 8001 1300 0001 8590 81. Our records indicate that this item was delivered on 05/04/2018 at 10:32 a.m. in CALABASAS, CA 91302. The scanned image of the recipient information is provided below.

Signature of Recipient :

Address of Recipient :

Thank you for selecting the Postal Service for your mailing needs.  If you require additional assistance, please contact your local post office or Postal Service representative.

Sincerely,
United States Postal Service

The customer reference number shown below is not validated or endorsed by the United States Postal Service. It is solely for customer use.

CV18896759 / 35206701 / NATIONAL TECHNICAL SYSTEMS INC / 2018-5-9 04:59
Customer Reference Number: Case  CV18896759
Sent To:  C/O RACHEL JOSHI, REGISTERED AGENT 24007 VENTURA BLVD., STE. 200 CALABASAS, CA 91302

# SUMMONS IN A CIVIL ACTION    COURT OF COMMON PLEAS, CUYAHOGA COUNTY JUSTICE CENTER

CLEVELAND OHIO 44113

| CASE NO. | | SUMMONS NO. |
|---|---|---|
| CV18896759 | D1 CM | 35206701 |

Rule 4 (B) Ohio

Rules of Civil
Procedure

|  |  |
|---|---|
| VALUE BASED SOLUTIONS, LLC | **PLAINTIFF** |
| **VS** | |
| NATIONAL TECHNICAL SYSTEMS, INC. | **DEFENDANT** |

## SUMMONS

NATIONAL TECHNICAL SYSTEMS, INC.
C/O RACHEL JOSHI, REGISTERED AGENT
24007 VENTURA BLVD., STE. 200
CALABASAS CA 91302

**You have been named defendant in a sums complaint** (copy attached hereto) filed in Cuyahoga County Court of Common Pleas, Cuyahoga County Justice Center, Cleveland, Ohio 44113, by the plaintiff named herein.

**You are hereby summoned and required to answer** the complaint within 28 days after service of this summons upon you, exclusive of the day of service.

**Said answer is required to be served on Plaintiff's Attorney** (Address denoted by arrow at left.)

**Your answer must also be filed with the court** within 3 days after service of said answer on plaintiff's attorney.

**If you fail to do so, judgment by default will be rendered against you for the relief demanded in the complaint.**

**Said answer is required to be served on:**

**Plaintiff's Attorney**



RONALD L HOUSE
41 SOUTH HIGH STREET

SUITE 2600
COLUMBUS, OH 43215-0000

**Case has been assigned to Judge:**

MAUREEN CLANCY
**Do not contact judge. Judge's name is given for attorney's reference only.**

**NAILAH K. BYRD**
Clerk of the Court of Common Pleas

| DATE SENT |
|---|
| Apr 27, 2018 |

By 
Deputy



COMPLAINT FILED    04/25/2018

CMSN130



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
**1200 Ontario Street**
**Cleveland, Ohio 44113**

**Court of Common Pleas**

**New Case Electronically Filed:**
**April 25, 2018 16:54**

By: DAVID R. MAYO 0014345

Confirmation Nbr. 1367262

VALUE BASED SOLUTIONS, LLC

      vs.

NATIONAL TECHNICAL SYSTEMS, INC.

CV 18 896759

**Judge:** MAUREEN CLANCY

**Pages Filed:** 30

## IN THE COURT OF COMMON PLEAS
## CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| **VALUE BASED SOLUTIONS, LLC** | ) | **CASE NO. _____** |
| **1651 Crossings Parkway** | ) | |
| **Suite B & C** | ) | **JUDGE _____** |
| **Westlake, Ohio 44145** | ) | |
| | ) | |
| **Plaintiff,** | ) | **COMPLAINT** |
| | ) | |
| **v.** | ) | **JURY DEMAND** |
| | ) | **ENDORSED HEREON** |
| **NATIONAL TECHNICAL** | ) | |
| **SYSTEMS, INC.** | ) | |
| **c/o Rachel Joshi, Registered Agent** | ) | |
| **24007 Ventura Blvd., Ste. 200** | ) | |
| **Calabasas, CA 91302** | ) | |
| | ) | |
| **Defendant.** | ) | |

For its Complaint against Defendant National Technical Systems, Inc. ("NTS"), Plaintiff

Value Based Solutions, LLC ("VBS") states as follows:

## A.    PARTIES, JURISDICTION AND VENUE

1.    Plaintiff VBS is an Ohio limited liability company with its office located at 1651

Crossings Parkway, Suite B & C, Westlake, Ohio 44145.

2.    Defendant NTS is a California corporation with its principal place of business

located at 24007 Ventura Blvd., Ste. 200, Calabasa, California 91302.

3.    Venue is proper in this county because Defendant NTS conducted activity that

gave rise to the claims for relief in this county and this is the county where all or part of the

claim for relief arose.

4.    This Court has jurisdiction over Defendant NTS because Plaintiff VBS's claims

arise from NTS's transaction of business in this State.

5.      Plaintiff VBS provides services to its clients that deliver value by reducing costs and/or enhancing profitability.

6.      Defendant NTS is a company that is engaged in the business of testing, inspecting and certification.

7.      In June 2016, NTS contacted VBS in Ohio about potentially engaging VBS for a project under which VBS would provide certain services to NTS.

8.      By multiple e-mails to and from Ohio and telephone calls to and from Ohio, VBS and NTS negotiated the terms of a contract under which VBS would provide strategic sourcing/contract renegotiation assistance to NTS.

**B.      THE CONTRACT.**

9.      On or about August 2, 2016, NTS engaged VBS for a project to provide strategic sourcing and contract renegotiation services under the terms of a Statement of Work and Standard Business Terms ("Contract"), a true and correct copy of which is attached hereto as Exhibit A.  The Contract as executed by NTS was submitted by NTS to VBS in Ohio.

10.      The nature of performance under the Contract resulted in in excess of 700 e-mails and in excess of 200 telephone calls between NTS to VBS to and from Ohio.  The payments to VBS described herein under the Contract were to be submitted by NTS to VBS in Ohio.  The Contract provides that Ohio law governs the Contract.

11.      Two of NTS's vendors that are subjects of the Contract as identified below are located in Ohio.  VBS performed its Contract obligations and, on NTS's behalf, negotiated the terms of contracts with NTS's Ohio vendors in Ohio by means of e-mails and telephone calls to and from NTS's vendors in Ohio.

12. The Contract provides that VBS would provide assistance in reducing NTS's indirect spending for services and/or products purchased by NTS from its vendors. VBS effected savings for NTS on its expenditures on the vendors that are the subject of the project by, among other things, meeting with NTS personnel to agree on the vendors to be included in the scope of the project, interview the individuals identified by NTS responsible for the vendors to understand the desired end state of the negotiations, acquire information about the best way to contact the incumbent vendors, request historical usage data electronically from incumbent vendors using a vendor authorization letter approved by NTS, analyze data received from vendors, gather competitive quotes (if applicable), gather and review contracts (if applicable), identify and execute negotiation strategies, conducted numerous discussions and email communications with vendors, negotiate savings and finalize negotiations with each vendor as appropriate, present savings ideas to NTS personnel for review and approval (in each case this included a savings calculation that estimated the magnitude of the savings), receive approval from NTS to implement savings, implement savings with vendors on a specific start date, and track and report status to NTS on a regular basis.

## C. THE SAVINGS TRACKER.

13. Under the terms of the Contract, VBS's fees are based on a percentage of the savings to NTS during the first year after the savings start date for each vendor. Projected savings, savings start date, who from NTS approved the savings and VBS fees are examples of fields included on a savings tracker ("Savings Tracker").

14. Vendor savings is defined under the Contract as the difference between what NTS was currently paying a vendor at execution of the Contract and the amount of the final contract price negotiated with the vendor by VBS.

15.     Under the Contract, NTS and VBS were responsible for jointly building, reviewing and approving the Savings Tracker model used to track and verify savings on NTS expenditures to its vendors and to derive a payment schedule.

16.     Payment by NTS of VBS's fees under the Contract are required in three payments as follows: (1) upon completion of the project, 16.66% of the projected first year savings per vendor as identified on the Savings Tracker; (2) six (6) months after completion of the project, 16.66% of the projected first year savings per vendor as identified on the Savings Tracker; and (3) twelve (12) months after completion of the project, the final payment based on the first year actual savings to NTS per vendor as identified on the Savings Tracker.  The total fee paid by NTS to VBS in the three payments would be 50% of NTS's first year actual savings per vendor. NTS was also obligated to pay all out-of-pocket expenses during the project at the time of the initial payment.

**D.      VBS AND NTS IDENTIFY 26 VENDORS FOR COST SAVINGS UNDER THE CONTRACT.**

17.     After execution of the Contract, VBS undertook evaluations in Ohio of certain of NTS's vendors based upon information provided to VBS by NTS to determine where savings may be captured for NTS on its vendor obligations.  VBS then commenced negotiations with vendors and managed and tracked savings for NTS in regard to the vendors.

18.     As a result of its review and evaluation, VBS identified twenty-six (26) vendors for which VBS could identify and negotiate expense savings opportunities for NTS.  From the commencement of work under the Contract through July 2017, VBS negotiated new prices and/or terms that generated verifiable savings for twenty-six (26) vendors.

19.     Upon information and belief, NTS further used VBS's work to negotiate terms leading to savings for NTS with three (3) of the vendors who were subject to the Contract.

20.    The progress of VBS's work and the savings provided to NTS by each vendor were monitored regularly by means of individual savings write-ups shared with NTS personnel and NTS leadership.  In addition, there were regularly scheduled meetings between the parties and with the written Savings Trackers in the form of Excel spreadsheets that were reviewed and approved by NTS.

E.    **THE REGULAR STATUS MEETINGS BETWEEN VBS AND NTS.**

21.    Beginning on December 22, 2016, VBS and NTS held periodic status meetings ("Status Meetings"), the intent of which was, among other things, to assess the status of VBS's work for each of NTS's vendors, for NTS to sign-off on VBS's work, to validate projected savings from VBS's work with each vendor, for NTS to approve savings start dates for each vendor, and to agree on the projected fees to be paid to VBS as derived from the savings for each vendor.

22.    VBS circulated the written Savings Trackers for the Status Meetings identifying items such as projected savings, communications with NTS personnel responsible for review and approval of each vendor's savings, NTS personnel who evaluated and approved the savings plan, the date NTS authorized implementation of the savings plan for each vendor and the date the new vendor pricing went into effect.  NTS reviewed and approved the information identified on the Savings Trackers on multiple occasions during the course of the project.

23.    The Status Meetings between VBS and NTS took place on December 22, 2016, February 9, 2017, April 11, 2017, May 9, 2017, June 8, 2017, and July 12, 2017, to discuss the progress and status of the project as reflected on the Savings Trackers.  As a result of the Status Meetings, NTS approved for each NTS vendor that is a subject of the Contract, among other things, annual estimated spend, projected gross savings, full savings over multiple years, sign off

date by NTS, savings start date, and amounts that would be payable on VBS's invoices as its fees for the year of the vendors' contracts.

**F.   VBS COMPLETES ITS OBLIGATIONS UNDER THE CONTRACT IN JULY 2017.**

24.     VBS completed all work in accordance with the Contract on or about July 12, 2017.  Prior to and at completion of the work NTS expressed only positive feedback as to the quality of services provided by VBS.

**G.   THE FINAL SAVINGS TRACKER DATED JULY 12, 2017, REFLECTS SAVINGS TO NTS AND PAYMENTS OWED TO VBS.**

25.     As VBS did with the prior periodic Status Meetings with NTS, VBS circulated a written Savings Tracker for the final Status Meeting held with NTS on July 12, 2017.  A true and correct copy of the July 12, 2017, Savings Tracker, with vendor names redacted for confidentiality reasons is attached hereto as Exhibit B.

26.     The written Savings Tracker is categorized by vendor.  By way of example, the first vendor identified on the Savings Tracker attached as Exhibit B, shows, among other things, that annual estimated spend by the vendor was $162,875.00, that NTS's projected gross savings over one year as a result of VBS's work for this vendor is $15,896.00, that NTS signed off on the work and savings insofar as related to the vendor, that the savings start date for the vendor is September 17, 2016, and that the three (3) invoices provided under the Contract for this vendor would be $2,649.36 each (with the third and final invoice trued up to account for actual one year savings for the vendor).

27.     Further, the July 12, 2017, final Status Meeting resulted in NTS's agreement to the following, among other things, as identified on the Savings Tracker.  Vendor names are given numbers to protect confidentiality:

| VENDOR (Name Redacted) | SIGN OFF BY NTS Employee | SIGN OFF DATE BY NTS | PROJECTED GROSS SAVINGS | SAVINGS START DATE | VBS INITIAL FEE (16.66%) | VBS SECOND FEE AT 6 MONTHS (16.66%) | VBS FINAL FEE AT 12 MONTHS (16.67% ACTUAL) |
|---|---|---|---|---|---|---|---|
| 1. | Rachel Joshi | 9/17/2016 | 15,896 | 9/17/2016 | 2649.36 | 2649.36 | 2649.36 |
| 2. | Tammy Buckley | 12/22/2017 | 2,880 | 1/1/2017 | 480.00 | 480.00 | 480.00 |
| 3. | Tammy Buckley | 1/11/2017 | 14,007 | 1/16/2017 | 2334.50 | 2334.50 | 2334.50 |
| 4. | Tammy Buckley | 1/24/2017 | 2,019 | 1/23/2017 | 336.54 | 336.54 | 336.54 |
| 5. | Tammy Buckley | 3/20/2017 | 1,185 | 3/21/2017 | 197.50 | 197.50 | 197.50 |
| 6. | Allan Lario | 3/22/2017 | 10,427 | 4/10/2017 | 1737.82 | 1737.82 | 1737.82 |
| 7. | Tammy Buckley | 4/11/2017 | 3,927 | 4/17/2017 | 654.50 | 654.50 | 654.50 |
| 8. | Chuck LaMarca Emily Turner | 4/28/2017 | 654 | 4/28/2017 | 109.00 | 109.00 | 109.00 |
| 9. | Renee Michalkiewicz | 4/27/2017 | 51,646 | 5/1/2017 | 8607.73 | 8607.73 | 8607.73 |
| 10. | Renee Michalkiewicz | 4/27/2017 | 48,389 | 5/1/2017 | 8064.83 | 8064.83 | 8064.83 |
| 11. | Renee Michalkiewicz | 4/27/2017 | 25,908 | 5/1/2017 | 4318.00 | 4318.00 | 4318.00 |
| 12. | Renee Michalkiewicz | 4/27/2017 | 14,624 | 5/1/2017 | 2437.33 | 2437.33 | 2437.33 |
| 13. | Renee Michalkiewicz | 4/27/2017 | 9,405 | 5/1/2017 | 1567.50 | 1567.50 | 1567.50 |
| 14. | Renee Michalkiewicz | 4/27/2017 | 3,086 | 5/1/2017 | 514.33 | 514.33 | 514.33 |
| 15. | Tammy Buckley | 4/26/207 | 32,972 | 5/1/2017 | 5495.28 | 5495.28 | 5495.28 |
| 16. | Emily Turner | 5/2/2017 | 1,013 | 5/15/2017 | 168.83 | 168.83 | 168.83 |
| 17. | Kim Bray | 5/23/2017 | 8,712 | 5/29/2017 | 1452.00 | 1452.00 | 1452.00 |
| 18. | Tammy Buckley | 6/8/2017 | TBD | 6/17/2017 | 0 | 0 | 0 |
| 19. | Tammy Buckley | 6/8/2017 | 695 | 6/19/2017 | 115.83 | 115.83 | 115.83 |
| 20. | Tammy Buckley | 6/23/2017 | 39,314 | 6/26/2017 | 6552.33 | 6552.33 | 6552.33 |
| 21. | Tammy Buckley | 7/7/2017 | 252 | 7/10/2017 | 42.00 | 42.00 | 42.00 |
| 22. | Megan Toomey | 7/14/2017 | 7,710 | 7/19/2017 | 1285.00 | 1285.00 | 1285.00 |
| 23. | Tammy Buckley | 7/18/2017 | 87,555 | 7/24/2017 | 14592.50 | 14592.50 | 14592.50 |

| 24. | Chuck LaMarca | Pending | 5,801 | Pending | 0 | 1450.25 | 1450.25 |
| 25. | Chuck LaMarca | Pending | 5,605 | Pending | 0 | 1401.25 | 1401.25 |
| 26. | Chuck LaMarca | Pending | 3,177 | Pending | 0 | 794.25 | 794.25 |
| | TOTAL | | 396,859 | | 63,712.73 | 67,358.48 | 67,358.48 |

See Exhibit B, attached hereto.

**H.     VBS INVOICES TO NTS.**

28.     During the July 12, 2017, final Status Meeting and with the project complete, VBS and NTS agreed to the invoice schedule. Specifically, NTS's Chuck LaMarca and Emily Turner agreed to the amounts of the invoices identified on the Savings Tracker and they approved the first invoice.

29.     As a result of completion of the project and with NTS's agreement, VBS issued to NTS an invoice dated July 20, 2017, in the amount of $64,312.73. Included with the July 20, 2017, invoice was the invoice schedule for all three (3) invoices. A true and correct copy of the July 20, 2017, invoice is attached hereto as Exhibit C.

30.     On September 22, 2017, VBS inquired about when the first invoice would be processed. On October 4, 2017, NTS responded that it would follow up on the invoice that day.

31.     Hearing nothing about payment of the first invoice, VBS inquired of NTS again on October 11, 2017, and October 16, 2017.

**I.     AFTER VBS COMPLETES ITS OBLIGATIONS UNDER THE CONTRACT, NTS'S VICE PRESIDENT OF PROCUREMENT DECIDES TO NOT PAY VBS.**

32.     It was fully understood by NTS that the invoices would be based on the aggregate of savings for each vendor over the first year of each vendor's contract as evidenced on Exhibit B. The savings measurement period is the 12-month period after the unique start date for each vendor savings. From the date of commencement of work by VBS, no NTS personnel, including

Renee Michalkiewicz, who executed the Contract on NTS's behalf, expressed dissatisfaction with calculation of invoices or disputed the information on the Savings Tracker.

33.  Approximately three (3) months after completion of VBS's obligations under the Contract, Ashley Collins of NTS introduced herself to VBS as being responsible for procurement as NTS's Vice President of Procurement. Ms. Collins had no prior dealings with VBS regarding the project.

34.  NTS failed to pay the July 20, 2017, invoice when due.  In October 2017, VBS tried to discuss non-payment of the July 20, 2017, invoice with Ms. Collins.  Ms. Collins informed VBS that she was hired to head procurement for NTS and that VBS was no longer needed.  Ms. Collins further explained that she was not sure why NTS was required to pay VBS because she was hired to cut expenses.  Ms. Collins further stated that she had been instructed by "Ray" (NTS's new CEO) to cancel VBS's contract and/or to minimize payments to VBS under the Contract.  Multiple attempts were made to explain to Ashley that the work we performed was complete and the only thing left was for VBS to get paid for our services per our contract.

35.  Approximately four (4) months after completion of the project, by letter dated November 17, 2017, Defendant NTS purported to terminate the Contract and stated that it refused to pay any sum whatsoever to NTS thereunder.  A true and correct copy of NTS's purported termination letter is attached hereto as Exhibit D.

36.  In furtherance of NTS's scheme to minimize payments owed to Plaintiff VBS, Defendant NTS asserted false, never-before communicated bases to excuse its failure to pay VBS. For instance, Defendant falsely asserted that Plaintiff failed to provide any services under the Contract, failed to provide any of the Contract deliverables, failed to provide any evidence of

savings and failed to perform any portion of the Contract. NTS's assertions are demonstrably false and fraudulent.

37.     The reasons given by NTS for its failure to perform were consistent with Ms. Collins' statements that she had been instructed to minimize making payments to VBS.

38.     On or about April 18, 2018, VBS issued to NTS the second invoice in the amount of $67,358.48. A true and correct copy of the invoice is attached hereto as Exhibit E. Both invoices issued to NTS by VBS remain unpaid. NTS stated that it will not pay either invoice.

39.     As shown by the Savings Tracker approved by NTS, the total of the third and final invoice to be issued was projected to be $67,358.48. However, the third invoice would be based on a final "true-up" and would be based not on projections, but on actual yearly savings per vendor.

40.     Prior to NTS's termination of the Contract, VBS was able to verify the actual cost savings for one vendor, the only vendor that had hit the one year anniversary of savings start date. This was done by pulling the actual usage data for the 12 months after the agreed upon savings start date. The verification of savings resulted in actual savings provided by VBS that exceeded the projections for the vendor by 42.61%. The nature of the vendor in relation to NTS's business gives VBS reason to believe some or all of the remaining savings projections for the remaining vendors were likewise underestimated in relation to actual usage and savings.

41.     Because the final fee to be paid to VBS is based upon actual savings, with a higher anticipated actual cost savings, VBS's fee under the Contract will be well in excess of $278,000.

### FIRST CLAIM FOR RELIEF
### (Breach of Contract)

42.     Plaintiff VBS incorporates the allegations above by reference.

43.     Plaintiff VBS has substantially performed its obligations under the Contract.

44.     Defendant NTS has breached and is in default under the Contract as a result of its failure to make the payments due as of July 20, 2017 and January 20, 2018 and its repudiation of the Contract in communicating that it would fail to make the payment due on July 20, 2018.

45.      As a result of Defendant NTS's breach of the Contract, Plaintiff VBS has been damaged in a sum in excess of $278,000.00, plus interest and costs.

<div align="center">

**SECOND CLAIM FOR RELIEF**
**(Breach of Implied Duty of Good Faith and Fair Dealing)**

</div>

46.     Plaintiff VBS incorporates the allegations above by reference.

47.     Every contract includes an implied duty of good faith and fair dealing.

48.     Defendant NTS has breached its duty to act in good faith.  NTS leaders who actually dealt with VBS, who understood and approved its performance under the Contract and who approved the Savings Tracker's identified savings upon completion of the project approved VBS's performance.

49.     Despite NTS's approval by those with whom VBS dealt, after new NTS management assumed responsibility, NTS's Ms. Collins specifically acknowledged that she had been instructed by "Ray" (the new CEO) to cancel the contract and/or minimize payments to VBS.

50.     NTS wrongly rejected invoices from VBS, refused to pay sums previously acknowledged as owed to VBS and failed to perform its obligations under the Contract based on false pretenses.

51.     NTS further prohibited VBS from contacting vendors to enable it to gather necessary information as required by the Contract to verify final actual savings.

52.     As a result of Defendant NTS's breach of its duty, Plaintiff VBS has been damaged in a sum in excess of $278,000.00, plus interest and costs.

WHEREFORE, Plaintiff VBS requests relief as follows:

1.     As to the First Claim for Relief, for judgment in Plaintiff VBS's favor and against Defendant NTS in the amount of in excess of $278,000.00, in an amount to be proved at trial, plus pre- and post-judgment interest;

2.     As to the Second Claim for Relief, for judgment in Plaintiff' VBS's favor and against Defendant NTS in the amount of in excess of $278,000.00, in an amount to be proved at trial, plus pre- and post-judgment interest;

3.     As to all Counts, for recovery of its attorney's fees and other expenses in an amount to be determined at trial and all other relief which may be allowed by law or as is just and equitable.

Respectfully submitted,

/s/ David R. Mayo
David R. Mayo (0014345)
Benesch, Friedlander, Coplan & Aronoff LLP
200 Public Square, Suite 2300
Cleveland, Ohio  44114-2309
(216) 363-4647 Phone
(216) 363-4588 Facsimile
dmayo@beneschlaw.com

Ronald L. House (0036752)
Benesch, Friedlander, Coplan & Aronoff LLP
41 S. High St., Suite 2600
Columbus, Ohio 43215
(614) 223-9338 Phone
(614) 223-9330 Facsimile
rhouse@beneschlaw.com
*Attorneys for Plaintiff Value Based Solutions, LLC*

## JURY DEMAND

Plaintiff Value Based Solutions, LLC hereby demands a jury trial on all issues so triable.

/s/ David R. Mayo
David R. Mayo (0014345)

# EXHIBIT

# A



**VALUE BASED SOLUTIONS**

6/13/2016

Ms. Renee Michalkiewicz
VP, Materials Operations and Operations Excellence
National Technical Systems
5 North Park Drive
Hunt Valley, MD 21030

Dear Renee:

We are pleased to submit this Statement of Work ("SOW") to provide strategic sourcing/contract renegotiation assistance to National Technical Systems, Inc. ("NTS"). We are excited about the opportunity to reduce your costs in various "indirect spend" categories. This letter will confirm our project approach, deliverables, and financial arrangements for our involvement.

## I.   **PROJECT APPROACH**

NTS has requested Value Based Solutions to provide assistance in reducing cost in different "indirect spend" categories. Examples of indirect spend categories are as follows:
1. Office supplies
2. Office equipment
3. Professional services
4. Hardware and software maintenance
5. Telephone systems and services
6. Freight
7. Packaging
8. Industrial supplies
9. Safety supplies
10. General supplies
11. Contract services
12. Temporary staffing/contract labor
13. Marketing and advertising

Value Based Solution services for this project include (but are not limited to):

1. Capture spend and identify improvement opportunities:
    1.1. Data gathering and analysis
    1.2. Set target savings range
    1.3. Meet with spend category and vendor business owners as appropriate
    1.4. Review contracts, invoices and vendor reporting as appropriate



**EXHIBIT**

**A**

2. Execute negotiation strategies and capture savings
   2.1. Develop individual negotiation strategies and tactics
   2.2. Create vendor letters
   2.3. Conduct discussions with individual vendors
   2.4. Track/report status of vendor interactions
   2.5. Negotiate savings (e.g. incumbent negotiations, RFP, etc.)
   2.6. Finalize negotiations/contract

3. Manage and track savings
   3.1. Develop savings tracking model
   3.2. Value Based Solutions and NTS mutually agree and signoff on the savings tracking model
   3.3. Report status/monitor savings
   3.4. Measurement and compliance checkpoints

The vendors included in the scope of this project are defined in Attachment B.


## II.    <u>PROJECT DELIVERABLES</u>

Value Based Solutions will provide the following deliverables as a result of this work effort:

1. Capture spend and identify improvement opportunities:
   1.1. List of spend opportunities with targeted savings potential

2. Execute negotiation strategies and capture savings
   2.1. Vendor letters
   2.2. Vendor interactions status report
   2.3. Proposed negotiated contract
   2.4. Final negotiated contract

3. Manage and track savings
   3.1. Savings tracking model
   3.2. Savings status/monitor report

NTS will be responsible for executing the final negotiated contracts by obtaining an authorized NTS signature and date on the final negotiated contracts.  In addition, NTS and Value Based Solutions will be responsible for jointly building, reviewing and approving the savings tracking model used to make financial payments to Value Based Solutions.

## III.    **FINANCIAL ARRANGEMENTS**

Our professional fees will be based on a percentage of the first year actual savings.  Savings is defined as the difference between what is currently being paid at the execution of this agreement and amount of the final negotiated and executed contract price.

The savings tracker model will be jointly created, reviewed and approved by Renee Michalkiewicz / designate at the conclusion of this engagement.

The payment schedule (defined below) is based upon mutually agreed calculations summarized in the savings tracker model.

1.  16.66% of projected first year savings per savings tracker model - payable upon completion of the project.
2.  16.66% of projected first year savings per savings tracker model - payable 6 months after completion of the project.
3.  The final payment schedule will be made 12 months after the completion of the project - per the savings tracker model.  The final payment is estimated at 16.67% of projected first year savings.  The final payment amount will be based on actual savings vs. projected savings for the entire year.

*\*\*Note: The savings tracker model deliverable will be used to track savings per contract, contract execution date and savings payment schedule.  Value Based Solutions will have the responsibility of maintaining the savings tracker model. NTS will have the responsibility to provide Value Based Solutions with spend by vendor information, contractual information and any other information deemed pertinent to this project.*

All out-of-pocket expenses will be billed as incurred during the span of the project.  We will bill for out-of-pocket expenses at time of initial payment.  All expenses must be approved in advance by NTS.

On this project, Renee Michalkiewicz / designate will serve as the primary NTS client contact point. Jeff Moore will serve as the primary contact for Value Based Solutions.

The Value Based Solutions staffing on this project is listed below:
- Jeff Moore as overall Project Leader
- Additional Value Based Solutions analyst - as needed

On occasion, Value Based Solutions will utilize outside partners or subject matter experts on specific contracts.

This engagement shall be governed by the provisions of Attachment A, 'Standard Business Terms' which are incorporated herein by reference.

We are excited about this opportunity to work with you on this important project.  Our goal on this project is to meet and exceed your expectations, so that you are completely satisfied with our services.  Our objective is to deliver valuable services so that you would be more than willing to refer additional work to us upon completion of this project.

I will contact your shortly to discuss any questions you may have regarding this letter.  Please do not hesitate to contact me at (216) 401-5004 if you have any questions or comments.


Very truly yours,



Jeffrey L. Moore
CEO/President
Value Based Solutions, LLC


**Agreed:**

On behalf of NTS, I hereby assent to the terms and conditions embodied in this Statement of Work ("SOW") and Standard Business Terms (Attachment A) incorporated by reference herein:

renee.michalkiewicz@nts.com  Digitally signed by renee.michalkiewicz@nts.com DN: cn=renee.michalkiewicz@nts.com Date: 2016.08.02 13:17:06 -04'00'

VP, Materials Operations and Operations Management
_____
Signature                                                                     Title

_Renee Michalkiewicz_____      _8/2/16_____
Name (Printed)                                                           Date

# Attachment A - Standard Business Terms

These Business Consulting Standard Business Terms ("Terms") shall govern the services ("Services") provided by Value Based Solutions LLC ("Value Based Solutions LLC" or "Consultant") as set forth in the Statement of Work executed by NTS (Client") and Value Based Solutions to which these Terms are attached.  These Terms, together with the Statement of Work, constitute the entire understanding and agreement between Client and Value Based Solutions with respect to the Services described in the Statement of Work ("Agreement"), supersede all prior oral and written communications, and may be amended, modified or changed (including changes in scope or nature of the Services or fees) only in writing when signed by both parties.  If there is a conflict between these Terms and the terms of any Statement of Work, these Terms shall govern.

### Section 1.  Fees, Expenses
Client shall pay Value Based Solutions the professional fees and the related expenses in accordance with the Statement of Work ("Agreement").  Unless otherwise agreed in the Agreement, Consultant's fees will be billed per the savings tracker model, and Consultant's reasonable expenses (e.g. travel, administrative support, report reproduction, etc.) in performing the Services will be reimbursed.  Client acknowledges that Value Based Solutions or its affiliates may receive commissions, rebates, referral fees or other consideration ("Benefits") pursuant to relationships with travel service providers, alliance companies, software, hardware and other vendors.  Client agrees that Value Based Solutions is not obligated to provide a credit to Client for such Benefits.  Invoices will be issued per the Agreement and savings tracker model.  Invoices are due upon receipt.  In the event of a sale of business, the outstanding fees related to the portion of business that is sold are due immediately.

In the event that a bankruptcy is initiated by or against Client, both Consultant and the Client agree that any unpaid compensation owing to Consultant for services rendered under this Agreement within the 180 day period prior to such bankruptcy filing shall be treated as, and given the priority of, wages, salaries and commissions under 11 U.S.C. Section 507(a)(4)(A) as if such charges were incurred by the direct employment by Client of such employees.  Client further agrees that it will not challenge or otherwise contest Consultant's assertion of such priority in any proof of claim filed by Consultant related to the unpaid charges.

### Section 2.  Client Responsibilities
As a prerequisite to Value Based Solution's delivery of Services, Client shall (i) fulfill the Client Responsibilities and ensure that all Assumptions are accurate; (ii) provide Value Based Solutions with reliable, accurate and complete information, as required; (iii) make timely decisions and obtain required management approvals; and (iv) furnish Value Based Solutions personnel with a suitable office environment and adequate resources and supplies, as needed.

### Section 3.  Confidentiality
With respect to this Agreement and any information supplied in connection with this Agreement and designated by the disclosing party as confidential, the recipient agrees to: (i) protect the confidential information in a reasonable and appropriate manner or in accordance with applicable professional standards; (ii) use confidential information only to perform its obligations under this Agreement; and (iii) reproduce confidential information only as required to perform its obligations under this Agreement.  This section shall not apply to information which is (i) publicly known, (ii) already known to the recipient; (iii) disclosed to a third party without restriction; (iv) independently developed; or (v) disclosed pursuant to legal requirement or order.  Subject to the foregoing, Value Based Solutions may disclose Client's confidential information to its subcontractors and affiliates, as required solely in connection with performing it's obligations under the Agreement.

### Section 4.  Deliverables
Subject to (i) Value Based Solution's right to retain copies of its work papers related to the deliverables items described in the Statement of Work (the "Deliverables"); and (ii) Client's payment in full of fees and expenses herein, Client shall retain all right, title and interest in and to the Deliverables, including but not limited to all patent, copyright, trademark and other intellectual property rights therein "Intellectual Property Rights".  This Agreement shall not preclude Value Based Solutions from developing for itself, or for others, materials which are competitive with those produced as a result of the Services provided hereunder, irrespective of their similarity to the Deliverables or other materials which may be delivered to Client pursuant to this Agreement provided that such materials (1) do not infringe on Client's Intellectual Property Rights and (2) do not violate the confidentiality provisions set forth in Section 3 of these terms.  Furthermore, Value Based Solutions shall retain all methodologies, processes, techniques, ideas, concepts, trade secrets and know-how embodied in the Deliverables that Value Based Solutions developed prior to the execution of this Agreement and supplied to Client in connection with this Agreement (the "Value Based Solutions Knowledge").  Subject to the confidentiality restrictions contained in Section 3, Client may use the Value Based Solutions Knowledge embedded in the Deliverables for the use of the Deliverables only.

## Section 5.  Acceptance
Client shall accept Deliverables which (i) conform to the requirements of the Statement of Work or (ii) where applicable, successfully complete the acceptance test plan.  Client will promptly give Value Based Solutions notification of any non-conformance of the Deliverables with such requirements ("Non-conformance"), and Value Based Solutions shall have a reasonable period of time, based

on the severity and complexity of the Non-conformance, to correct the Non-conformance. If Client uses the Deliverable before acceptance, fails to promptly notify Value Based Solutions of any Non-conformance, or unreasonably delays the beginning of acceptance testing, then the Deliverable shall be considered accepted by the Client.

# Attachment A - Standard Business Terms (continued)

### Section 6.  Warranty
(a) Value Based Solutions warrants that the Services shall be performed with reasonable care in a diligent and competent manner. Value Based Solution's sole obligation shall be to correct any non-conformance with this warranty, provided that Client gives Value Based Solutions written notice within thirty (30) days after the Services are performed or successful completion of the acceptance test plan, if applicable.
(b) Value Based Solutions does not warrant and is not responsible for any third party products or services. Client's sole and exclusive rights and remedies with respect to any third party products or services are against the third party vendor and not against Value Based Solutions.
(C) THIS SECTION 6 IS VALUE BASED SOLUTIONS'S ONLY WARRANTY CONCERNING THE SERVICES AND ANY DELIVERABLE, AND IS MADE EXPRESSLY IN LIEU OF ALL OTHER WARRANTIES AND REPRESENTATIONS, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT, OR FITNESS FOR A PARTICULAR PURPOSE, OR OTHERWISE.

### Section7.  Risk Allocation
(a) Value Based Solution's total liability relating to this Agreement shall in no event exceed the fees Value Based Solutions receives hereunder for the portion of the work giving rise to liability, or include any special, consequential, incidental or exemplary damages or loss (nor any lost profits, savings or business opportunity).
(b) As Value Based Solutions is performing the Services solely for the benefit of Client, Client will indemnify Value Based Solutions, its affiliates and their partners, principals and personnel against all costs, fees, expenses, damages and liabilities (including defense costs) associated with any third party claim, relating to or arising as a result of the Services, Client's use of the Deliverables, or this Agreement.
(c) Value Based Solutions will indemnify Client against any damage or expense relating to bodily injury or death of any person or damage to real and/or tangible personal property incurred while Value Based Solutions is performing the Services and to the extent caused by the negligent or willful acts or omissions of Value Based Solution's personnel or agents in performing the Services.
(d) The provisions of this Section 8 are intended to apply in all circumstances, regardless of the grounds or nature of any claim asserted (including contract, statute, any form of negligence, whether of Client, Value Based Solutions, or others, tort, strict liability or otherwise) and whether or not the party seeking indemnification was advised of the possibility of the damage or loss asserted, to the extent not contrary to applicable law.
(e) Any action against Value Based Solutions must be brought within eighteen (18) months after the cause of action arises.

### Section 8.  Personnel
(a) While Value Based Solutions shall attempt to comply with Client's request for specific individuals, Value Based Solutions shall be responsible for assigning and re-assigning its personnel, as appropriate, to perform the Services.
(b) During the term of this Agreement, and for a period of six (6) months following the expiration or termination thereof, neither party will actively solicit the employment of the personnel of the other party involved directly with providing Services hereunder.

### Section 9.  Termination
(a) This Agreement may be terminated at any time by either party upon fifteen (15) days written notice to the other.
(b) Client shall pay Value Based Solutions for all Services rendered and expenses incurred as of the date of termination.
(c) Except for matters related to confidentiality or intellectual property rights, the parties shall first attempt to resolve any dispute or alleged breach internally by escalating it through management and, prior to pursuing litigation, use a mutually acceptable alternative dispute resolution process.

# Attachment A - Standard Business Terms (continued)

<u>Section 10.  General</u>
(a) Neither party shall be liable for any delays or failures in performance due to circumstances beyond its reasonable control.
(b) This Agreement may not be assigned or otherwise transferred without the prior express written consent of the other party.  Value Based Solutions may, without Client's written consent, use subcontractors to provide Services.
(c) Any notices given pursuant to this Agreement shall be in writing, delivered to the address set forth in the Statement of Work, and shall be considered given when received.
(d) No term of this Agreement shall be deemed waived, and no breach of this Agreement excused, unless the waiver or consent is in writing signed by the party granting such waiver or consent.
(e) If any term or provision of this Agreement is determined to be illegal or unenforceable, such term or provision shall be deemed stricken, and all other terms and provisions shall remain in full force and effect.
(f) This Agreement does not make either party an agent or legal representative of the other party, and does not create a partnership or joint venture.  Both parties are independent contractors and principals for their own accounts.
(g) Sections 3 through 10 of these Terms shall survive the expiration or termination of this Agreement.
(h) The laws of the State of Ohio shall govern this Agreement.
(i) Client acknowledges that:  (i) Value Based Solutions and Client may correspond or convey documentation via Internet e-mail unless Client expressly requests otherwise, (ii) neither party has control over the performance, reliability, availability, or security of Internet e-mail, and (iii) Value Based Solutions shall not be liable for any loss, damage, expense, harm or inconvenience resulting from the loss, delay, interception, corruption, or alteration of any Internet e-mail due to any reason beyond its reasonable control.

# Attachment B - List of Vendors

Vendors:

1. Per mutually agreed upon master vendor spreadsheet

# EXHIBIT
# B



| Vendor Name | Spend Category | Spend Sub Category | Annual Estimated Spend | Business Owner | Current Spend Definition/Calculation | Renegotiation Results | Incumbent Vendor (Y/N) | Comments | Projected Gross Savings | Savings % | Multi-Year (Y/N) | Savings Duration (Years) | Full Savings | Sign Off by Business Owner | Sign Off Date by Business Owner | Savings Start Date | Value Based Solutions Initial Fee (16.66%) | Value Based Solutions Second Fee - at 6 months (16.66%) | Value Based Solutions Final Fee - at 12 months (16.67% / actual) | VBS Resource |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [redacted] | Professional Services | Credit Card Processing Fees | $ 162,875 | Rachel Joshi | May, Jun, July statemenets provided by NTS | Negotiated improved rates by moving to NCR. Decided to stay with Sterling. | Y | See embedded comment | $ 15,896 | 9.76% | Y | 3 | $ 47,688 | Rachel Joshi | 9/17/2016 | 9/17/2016 | $ 2,649.36 | $ 2,649.36 | $ 2,649.36 | Sherman |
| [redacted] | Temp labor and recruiting | Direct placement | $ 24,000 | Tammy Buckley | Last 12 months spend activity provided by vendor | Negotiated lower, tiered rate schedule | Y | See embedded comment | $ 2,880 | 12.00% | Y | 3 | $ 8,640 | Tammy Buckley | 12/22/2017 | 1/1/2017 | $ 480.00 | $ 480.00 | $ 480.00 | Schmit |
| [redacted] | Temp labor and recruiting | Temporary labor | $ 127,921 | Tammy Buckley | Last 12 months spend activity provided by vendor | Negotiated improved rate structure | Y | See embedded comment | $ 14,007 | 10.95% | Y | 3 | $ 42,021 | Tammy Buckley | 1/13/2017 | 1/16/2017 | $ 2,334.50 | $ 2,334.50 | $ 2,334.50 | Schmit |
| [redacted] | Temp labor and recruiting | Temporary labor | $ 18,848 | Tammy Buckley | Last 12 months spend activity provided by vendor | Negotiated improved rate structure | Y | See embedded comment | $ 2,019 | 10.71% | Y | 3 | $ 6,058 | Tammy Buckley | 1/24/2017 | 1/23/2017 | $ 336.54 | $ 336.54 | $ 336.54 | Schmit |
| [redacted] | Temp labor and recruiting | Temporary labor | $ 22,028 | Tammy Buckley | Last 12 months spend activity provided by vendor | Negotiated improved rate structure | Y | See embedded comment | $ 1,185 | 5.38% | Y | 3 | $ 3,555 | Tammy Buckley | 3/20/2017 | 3/21/2017 | $ 197.50 | $ 197.50 | $ 197.50 | Schmit |
| [redacted] | Facility services | Uniforms / mats | $ 22,483 | Allan Lario | Last 12 months spend activity provided by vendor | Negotiate lower rates in exchange for new improved 3-year agreement | Y | See embedded comment | $ 10,427 | 46.38% | Y | 3 | $ 31,281 | Allan Lario | 3/22/2017 | 4/10/2017 | $ 1,737.82 | $ 1,737.82 | $ 1,737.82 | Schmit |
| [redacted] | Temp labor and recruiting | Temporary labor | $ 28,423 | Tammy Buckley | Last 12 months spend activity provided by vendor | Negotiated improved rate structure | Y | See embedded comment | $ 3,927 | 13.82% | Y | 3 | $ 11,781 | Tammy Buckley | 4/11/2017 | 4/17/2017 | $ 654.50 | $ 654.50 | $ 654.50 | Schmit |
| [redacted] | Industrial supplies / MRO | Gases | $ 1,375 | Chuck LaMarca Emily Turner | Last 12 months spend as provided by supplier. | Negotiated lower pricing on propane cylinders and also removal of monthly rental fee. | Y | See embeded comment | $ 654 | 47.56% | N | 1 | $ 654 | Chuck LaMarca Emily Turner | 4/28/2017 | 4/28/2017 | $ 109.00 | $ 109.00 | $ 109.00 | D. Moore |
| [redacted] | Facility services | Calibration / testing | $ 351,336 | Renee Michalkiewicz | Annual A/P spend and cuurent price per unit | Reduced spend by naming primary supplier. | Y | See embedded comment | $ 51,646 | 14.70% | Y | 3 | $ 154,939 | Renee Michalkiewicz | 4/27/2017 | 5/1/2017 | $ 8,607.73 | $ 8,607.73 | $ 8,607.73 | Foster Sherman |
| [redacted] | Facility services | Calibration / testing | $ 158,135 | Renee Michalkiewicz | Annual A/P spend and cuurent price per unit | Reduced spend by naming primary supplier. | Y | See embedded comment | $ 48,389 | 30.60% | Y | 3 | $ 145,167 | Renee Michalkiewicz | 4/27/2017 | 5/1/2017 | $ 8,064.83 | $ 8,064.83 | $ 8,064.83 | Foster Sherman |
| [redacted] | Facility services | Calibration / testing | $ 172,722 | Renee Michalkiewicz | Annual A/P spend and cuurent price per unit | Reduced spend by naming primary supplier. | Y | See embedded comment | $ 25,908 | 15.00% | Y | 3 | $ 77,724 | Renee Michalkiewicz | 4/27/2017 | 5/1/2017 | $ 4,318.00 | $ 4,318.00 | $ 4,318.00 | Foster Sherman |
| [redacted] | Facility services | Calibration / testing | $ 100,033 | Renee Michalkiewicz | Annual A/P spend and cuurent price per unit | Reduced spend by naming primary suppler. | Y | See embedded comment | $ 14,624 | 14.62% | Y | 3 | $ 43,872 | Renee Michalkiewicz | 4/27/2017 | 5/1/2017 | $ 2,437.33 | $ 2,437.33 | $ 2,437.33 | Foster Sherman |
| [redacted] | Facility services | Calibration / testing | $ 31,155 | Renee Michalkiewicz | Annual A/P spend and cuurent price per unit | Reduced spend by naming primary supplier. | Y | See embedded comment | $ 9,405 | 30.19% | Y | 3 | $ 28,215 | Renee Michalkiewicz | 4/27/2017 | 5/1/2017 | $ 1,567.50 | $ 1,567.50 | $ 1,567.50 | Foster Sherman |
| [redacted] | Facility services | Calibration / testing | $ 30,867 | Renee Michalkiewicz | Annual A/P spend and cuurent price per unit | Reduced spend by naming primary supplier. | Y | See embedded comment | $ 3,086 | 10.00% | Y | 3 | $ 9,258 | Renee Michalkiewicz | 4/27/2017 | 5/1/2017 | $ 514.33 | $ 514.33 | $ 514.33 | Foster Sherman |
| [redacted] | Temp labor and recruting | Temporary labor | $ 153,188 | Tammy Buckley | Last 12 months spend activity provided by vendor | Negotiated improved rate structure | Y | See embedded comment | $ 32,972 | 21.52% | Y | 3 | $ 98,915 | Tammy Buckley | 4/26/2017 | 5/1/2017 | $ 5,495.28 | $ 5,495.28 | $ 5,495.28 | Schmit |
| [redacted] | Industrial supplies / MRO | Gases | $ 4,335 | Emily Turner | Last 12 months spend on rental and miscellaneous fees as provided by supplier. | Negotiated lower pricing on rental rates and delivery fees. | Y | See embedded comment | $ 1,013 | 23.37% | N | 1 | $ 1,013 | Emily Turner | 5/2/2017 | 5/15/2017 | $ 168.83 | $ 168.83 | $ 168.83 | D. Moore |
| [redacted] | Facility services | Uniforms / mats | $ 20,259 | Kim Bray | Last 12 months spend activity provided by vendor | Negotiated improved rate structure | Y | See embedded comment | $ 8,712 | 43.00% | Y | 5 | $ 43,560 | Kim Bray | 5/23/2017 | 5/29/2017 | $ 1,452.00 | $ 1,452.00 | $ 1,452.00 | Schmit |
| [redacted] | Temp labor and recruiting | Temporary labor | $ - | Tammy Buckley | No historical spend | Negotiated improved rate structure | Y | See embedded comment | TBD | | Y | 3 | TBD | Tammy Buckley | 6/8/2017 | 6/17/2017 | $ - | $ - | $ - | Schmit |
| [redacted] | Temp labor and recruiting | Temporary labor | $ 17,791 | Tammy Buckley | Last 12 months spend activity provided by vendor | Negotiated improved rate structure | Y | See embedded comment | $ 695 | 3.91% | Y | 3 | $ 2,085 | Tammy Buckley | 6/8/2017 | 6/19/2017 | $ 115.83 | $ 115.83 | $ 115.83 | Schmit |
| [redacted] | Temp labor and recruiting | Temporary labor | $ 156,425 | Tammy Buckley | Last 12 months spend activity provided by vendor | Negotiated improved rate structure | Y | See embedded comment | $ 39,314 | 25.13% | Y | 3 | $ 117,942 | Tammy Buckley | 6/23/2017 | 6/26/2017 | $ 6,552.33 | $ 6,552.33 | $ 6,552.33 | Schmit |
| [redacted] | Temp labor and recruiting | Temporary labor | $ 1,644 | Tammy Buckley | Last 12 months spend as provided by supplier and Tammy Buckley combined. | Negotiated improved rate structure. Tansition volume to Aerotek | Y | See embedded comment | $ 252 | 15.33% | Y | 3 | $ 756 | Tammy Buckley | 7/7/2017 | 7/10/2017 | $ 42.00 | $ 42.00 | $ 42.00 | Schmit |
| [redacted] | Industrial supplies / MRO | Gases | $ 11,825 | Rob Bridges | Last 12 months spend as provided by supplier. | Negotiated lower pricing on propane and lower fees. | Y | See embedded comment | $ 7,710 | 65.20% | Y | 1 | $ 7,710 | Megan Toomey | 7/14/2017 | 7/19/2017 | $ 1,285.00 | $ 1,285.00 | $ 1,285.00 | D. Moore |
| [redacted] | Temp labor and recruiting | Temporary labor | $ 467,638 | Tammy Buckley | Last 12 months spend as provided by supplier and Tammy Buckley combined. | Negotiated improved rate structure | Y | See embedded comment | $ 87,555 | 18.72% | Y | 3 | $ 262,665 | Tammy Buckley | 7/18/2017 | 7/24/2017 | $ 14,592.50 | $ 14,592.50 | $ 14,592.50 | Schmit |
| [redacted] | Office supplies and equipment | Office supplies | $ 27,987 | Chuck LaMarca | Last 12 months spend activity provided by vendor | RFQ results indicate My Office Supplies. | N | See embedded comment | $ 5,801 | 20.73% | Y | 3 | $ 17,403 | Chuck LaMarca | Pending | Pending | $ - | $ 1,450.25 | $ 1,450.25 | Sherman |
| [redacted] | Office supplies and equipment | Office supplies | $ 27,547 | Chuck LaMarca | Last 12 months spend activity provided by vendor | RFQ results indicate My Office Supplies. | N | See embedded comment | $ 5,605 | 20.35% | Y | 3 | $ 16,815 | Chuck LaMarca | Pending | Pending | $ - | $ 1,401.25 | $ 1,401.25 | Sherman |
| [redacted] | Office supplies and equipment | Office supplies | $ 21,616 | Chuck LaMarca | Last 12 months spend activity provided by vendor | RFQ results indicate My Office Supplies. | N | See embedded comment | $ 3,177 | 14.70% | Y | 3 | $ 9,531 | Chuck LaMarca | Pending | Pending | $ - | $ 794.25 | $ 794.25 | Sherman |
| | | | $ 2,161,456 | | | | | | $ 396,858 | 18.4% | | | $ 1,189,246 | | | | $ 63,712.73 | $ 67,358.48 | $ 67,358.48 | |

tabbies
EXHIBIT
B

# EXHIBIT

# C



# INVOICE

| Date | Invoice # |
|------|-----------|
| 7/20/2017 | 15013 |

**Bill To**

Chuck LaMarca
VP of Operations
National Technical Systems, Inc.
24007 Ventura Blvd
Calabasas, CA 91302

| Project | Description | Job Manager |
|---------|-------------|-------------|
| NAT101 | First of three invoices for Cost Containment Project | Roland Ciaramitaro |

| Hours | Description | Rate | Amount |
|-------|-------------|------|--------|
| | • Invoice for Services per agreed Client Savings Tracker dated 7/12/2017 | ---- | $63,712.73 |
| | • Out of Pocket Expenses | | $600.00 |

Total: $64,312.73

**REMIT TO:**
**Value Based Solutions, LLC**
1651 Crossings Parkway Suites B & C
Westlake, OH  44145

**CONTACT:**
Jeff Moore
jmoore@value-based-solutions.com
216-401-5004

**EXHIBIT**

C

tabbies

# EXHIBIT

# D



www.nts.com

November 17, 2017

Jeffrey L. Moore        BY CERTIFIED MAIL, RETURN RECEIPT
CEO/President
Value Based Solutions, LLC
1651 Crossings Parway, Suite B & C
Westlake, Ohio 44145

Dear Mr. Moore:

Subject: Termination for Default of that Certain Business Agreement ("the Agreement") Consisting of a Statement of Work (dated 6/13/16) and Attachment A thereto, between NTS Technical Systems and Value Based Solutions.

You are hereby directed to immediately terminate any and all activities under the subject Agreement, pursuant to a Termination for Default under Section 9 of Attachment A to the Agreement.

Value Base Solutions has:

1. Failed to provide any of the services described in Section II and III of the Statement of Work.
2. Failed to provide any of the deliverable items identified in Section II the Statement of Work.
3. Failed to provide any substantive evidence of any saving occasioned by Value Based Solutions.

These failures constitute a material breach of the Agreement because:

1. You have failed to perform any portion of the Agreement, and no cure is forthcoming.
2. NTS Technical Systems has been deprived of the benefit it could reasonably expect from the Agreement.
3. It is unlikely that you can cure this breach.
4. You have failed to act in accordance with the principles of good faith and fair dealing

As there has been no value accruing to NTS, and you have not, to date, provided any evidence of your completing any portion of the contract, NTS will not pay any of your fees.  The subject Agreement is hereby terminated for default, under Section 9 of Attachment A in the subject Agreement, because you have failed to perform any portion of the contract.

Sincerely yours,

Martin M Dresser

Martin M. Dresser
Sr. Dir., Contracts and Export Compliance
NTS. Technical Systems
Desk: 760-298-3247; Cell: 310-621-0091
E-mail: marty.dresser@nts.com



EXHIBIT

D

# EXHIBIT
# E



# INVOICE

| Date | Invoice # |
|------|-----------|
| January 2018 | 15014 |

**Bill To**

Ashley Collins
Vice-President, Procurement
National Technical Systems, Inc.

| Project | Description | Job Manager |
|---------|-------------|-------------|
| NAT101 | Second of three invoices for Cost Containment Project | Roland Ciaramitaro |

| Hours | Description | Rate | Amount |
|-------|-------------|------|--------|
| | • Invoice for Services per agreed Client Savings Tracker dated 7/12/2017v2 | ---- | $67,358.48 |

Total:     $67,358.48

**REMIT TO:**
**Value Based Solutions, LLC**
1651 Crossings Parkway Suites B & C
Westlake, OH  44145

**CONTACT:**
Jeff Moore
jmoore@value-based-solutions.com
216-401-5004



EXHIBIT

E